IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| LOUIS ALVAREZ VELEZ,<br><br>              Plaintiff,<br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>              Defendant. | Civil No. 17-02914 (RBK)<br><br>**OPINION** |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal of Plaintiff Louis Alvarez Velez (Doc. No. 1) for review of the Administrative Law Judge's ("ALJ") decision denying Plaintiff's Social Security Income benefits claim. As explained below, the Court **REMANDS** this matter for further proceedings consistent with this Opinion.

**I. BACKGROUND**[1]

On August 23, 2011, Plaintiff, who "understands very little" English (R. at 42), filed a benefits application alleging that he has been disabled since September 17, 2010 based on bipolar disorder, schizophrenia, psychosis, hyperactivity, mood swings, immaturity, anxiety, insomnia, depression, aggressive behavior, frequent headaches, and low back pain. (R. at 27, 32.) Plaintiff's claim was denied initially and on reconsideration. (R. at 27.) Plaintiff then requested a hearing, and four were held in total. (R. at 27.) The first occurred on October 2, 2013 in Puerto Rico, where Plaintiff's application was originally pending. (R. at 86–87.) During that brief hearing, the ALJ explained that he would transfer Plaintiff's case to New Jersey. (R. at

---

[1] Additional facts are set forth as needed in the discussion section below.

1

86.) The second hearing occurred on July 17, 2014 (R. at 74–83), and the third on February 9, 2015. (R. at 63–71.) The fourth occurred on August 6, 2015. (R. at 42–60.)

Although clarified by neither party, Plaintiff may have retained an attorney named Eric Shore in some capacity for some portion of this case. (R. at 86, 113–114.) But Plaintiff appeared and testified at his hearings without an attorney or representative. (R. at 27.) At the July 17, 2014 hearing, the ALJ questioned Plaintiff about representation:

> Q: Do you want an attorney to represent you or something? She can translate anything.
> A: That's nice. I don't have an attorney.
> Q: I know that, but I'm offering you the opportunity to get one.
> A: Thank you. We-No, don't worry. I'll tell you by myself.
> Q: If you change your mind let me know and I'll stop the hearing and let you get an attorney. If the reason that you're not getting one is because you think you can't afford one—
> A: All right
> Q: You possibly might qualify for a free attorney or if you don't then the private attorneys cannot charge unless they win the case. It's up to you. Do you want to go ahead?
> A: OK

(R. at 75.) At the February 9, 2015 follow-up hearing, the ALJ asked:

> Q: You still don't want a lawyer? Because I asked you that last time.
> A: Yes, I remember he asked me if I wanted an lawyer, but we haven't found one. It's better-
> Q: You haven't worked at all since 2010?

(R. at 68.) Although an interpreter attended the hearings, it is not entirely clear which portions were done in English, including the ALJ's questioning about Plaintiff's right to counsel. The transcripts suggest, however, that the ALJ's two discussions of Plaintiff's right to counsel were done in English, not Spanish. For example, moments after the ALJ initially asked Plaintiff if he wanted an attorney, the ALJ asked Plaintiff a different question and stated that Plaintiff could "tell her in Spanish," suggesting that the previous dialogue had been in English. (R. at 75–76.) In a later exchange, the ALJ similarly stated that Plaintiff could speak in Spanish, suggesting that

2

speaking in Spanish was the exception. (R. at 81.) Moreover, just before the ALJ followed up with Plaintiff about counsel at the February 9, 2015 hearing, the ALJ asked Plaintiff if he understood English, to which Plaintiff replied "yes," and the ALJ remarked that Plaintiff's mom "need[ed] the interpreter more than" Plaintiff. (R. at 67.) And just a few questions after the ALJ asked if Plaintiff still did not want a lawyer, Plaintiff apologized for his English skills because he does not practice, suggesting the previous dialogue had been in English, not Spanish. (R. at 68.)[2]

Although the extent of the ALJ's efforts are not entirely clear, the ALJ also made some attempt to subpoena records from at least two places in Puerto Rico and Cumberland County Guidance Center, which did not respond to at least one pre-2014 request. (R. at 77–78, 80.) At the conclusion of the third hearing, the ALJ ordered Plaintiff to see another doctor before he would decide the case. (R. at 71.) At two of the hearings, the ALJ took testimony from Vocational Experts ("VE"), although his decision only appears to reference the second. (R. at 27.) As contained in the transcripts, the ALJ did not notify Plaintiff that he could cross-examine those witnesses, and Plaintiff did not. (R. at 54–58, 81–83.) Consistent with the second VE's testimony, the ALJ found that Plaintiff could perform jobs in the national economy, and thus that Plaintiff was not disabled. (R. at 35.)

## II. DISCUSSION

Plaintiff argues that the ALJ did not obtain a valid waiver of his statutory and regulatory right to counsel. *See Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155, 157–58 (3d Cir. 2008)). A claimant must be notified of this right and can waive it "only by a knowing and intelligent waiver." *Id.* Remand is proper if "the lack of counsel prejudices a claimant or where the lack of counsel leads to an administrative proceeding marked by

---

[2] Even if the relevant exchanges about Plaintiff's right to representation were translated to Plaintiff in Spanish, the conclusions in this Opinion would not change.

3

unfairness." *Phifer v. Comm'r of Soc. Sec.*, 84 F. App'x 189, 190–91 (3d Cir. 2003). Remand is proper here, as prejudice resulted from Plaintiff's insufficient waiver of his right to counsel.

### A. Knowing and Intelligent Waiver

Unlike other circuits, the Third Circuit has not clearly defined a standard for what an ALJ must do to obtain a "knowing and intelligent" waiver of a *pro se* claimant's right to counsel. *See George v. Comm'r of Soc. Sec.*, No. 13-cv-5179, 2014 WL 3955071, at *2 (D.N.J. Aug. 13, 2014) (noting the Third Circuit's lack of "specific guidelines" on the issue). But in *Vivaritas*, the Third Circuit provided commentary that has led to different approaches among district courts. 264 F. App'x at 157–59. There, the Third Circuit cited—but did not explicitly adopt—the Seventh Circuit's "knowing and intelligent" waiver test. *Id.* at 157 n.1 ("Although we have referred to decisions by other courts of appeals . . . we have not required that ALJs explain each of these listed items that the Court of Appeals for the Seventh Circuit case law requires."). Under that test, an ALJ must explain: "(1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Analyzing the colloquy at issue, the *Vivaritas* court held that it would "ordinarily" support a "knowing and intelligent" waiver of the right to counsel. *Vivaritas*, 264 Fed. App'x at 159. Among other things, the colloquy explained, as required under prong one of the Seventh Circuit's test, "what a representative could do" for the claimant, including case presentation, organization, and evidence gathering. *Id.*

Courts assessing waiver issues have read *Vivaritas* differently. Although *Vivaritas* noted that the Third Circuit had not required ALJ's to explain each of the Seventh Circuit's criteria, some courts looked at how *Vivaritas* actually reasoned and held that it "accord[ed] with" the

4

Seventh Circuit's waiver test. *See Yakely v. Astrue*, No. 12-cv-857, 2013 WL 1010671, at \*5 (D.N.J. Mar. 13, 2013); *George*, 2014 WL 3955071, at \*2 (reading *Vivaritas* to have "relied upon" and "applied" the Seventh Circuit's waiver standard "for what must be explained" to a claimant). Thus, some post-*Vivaritas* courts apply the Seventh Circuit's or substantially similar waiver tests. *See, e.g.*, *Hopson v. Comm'r of Soc. Sec.*, No. 16-cv-6042, 2018 WL 1446405, at \*6 (D.N.J. Mar. 23, 2018); *Yakely*, 2013 WL 1010671, at \*5; *Nevins v. Comm'r of Soc. Sec.*, No. 16-cv-5765, 2017 WL 2450280, at \*2 (D.N.J. June 5, 2017) (applying substantially similar test requiring ALJ to explain "the valuable role that an attorney could play in the proceedings, the possibility of free counsel, and the limitations on attorney's fees to 25 percent of any eventual awards" (citing *Vance v. Heckler*, 579 F. Supp 318, 321 (N.D. Ill. 1984)).

Other courts have read *Vivaritas* as declining to adopt a "rigid" approach that an ALJ must follow to obtain a valid waiver. *See, e.g.*, *Morris v. Comm'r of Soc. Sec.*, No. 17-cv-757, 2018 WL 395736, at \*4 (D.N.J. Jan. 12, 2018); *Whetstone o/b/o U.W. v. Berryhill*, No. 16-cv-8602, 2017 WL 5047899, at \*2 (D.N.J. Nov. 2, 2017); *McGrew v. Colvin*, No. 13-cv-0144, 2013 WL 2948448, at \*5 (W.D. Pa. June 14, 2013). But importantly, these courts have also addressed whether an ALJ explained how counsel could help in the proceedings, as they assess a waiver's validity by comparing the ALJ's colloquy to the one containing that information in *Vivaritias*. In fact, one court analyzed the various cases cited in *McGrew*, which read *Vivaritas* as "declining to adopt" the Seventh Circuit's test, *id.*, and extrapolated two "general guidelines," including that the ALJ "should notify the claimant as to what a representative or counsel would do for him or her at the hearing." *Rhodes v. Colvin*, No. 12-cv-1138, 2014 WL 1095327, at \*6 (M.D. Pa. Mar. 19, 2014).

5

The Court need not resolve the precise standards for what constitutes a "knowing and intelligent" waiver of the right to counsel, for whatever the proper approach in this Circuit, a valid waiver does not appear on the face of this record. Again, the exchanges were:

> Q: Do you want an attorney to represent you or something? She can translate anything.
> A: That's nice. I don't have an attorney.
> Q: I know that, but I'm offering you the opportunity to get one.
> A: Thank you. We-No, don't worry. I'll tell you by myself.
> Q: If you change your mind let me know and I'll stop the hearing and let you get an attorney. If the reason that you're not getting one is because you think you can't afford one—
> A: All right
> Q: You possibly might qualify for a free attorney or if you don't then the private attorneys cannot charge unless they win the case. It's up to you. Do you want to go ahead?
> A: OK

(R. at 75.) At the February 9, 2015 follow-up hearing, the ALJ asked:

> Q: You still don't want a lawyer? Because I asked you that last time.
> A: Yes, I remember he asked me if I wanted an lawyer, but we haven't found one. It's better-
> Q: You haven't worked at all since 2010?

(R. at 68.) These exchanges fail under the Seventh Circuit's test as applied by courts in this district and under *Vivaritas*, to the extent *Vivaritas* has been read to explicitly or implicitly accord with that test. Although the ALJ noted that Plaintiff could possibly get a free attorney and that some attorneys work on contingency, the ALJ did not explain that their fees are capped at 25 percent of past due benefits and require court approval. Nor did the ALJ explain how an attorney could aid in the proceedings, including by gathering evidence, making arguments, or presenting the case. Thus, the colloquy also fails under the non-rigid comparative approach because unlike here, the *Vivaritas* colloquy and others held sufficient have explained to the

6

claimant that a representative could help in these ways. *Vivaritas*, 264 F. App'x at 158.[3] Failure to include this information, by contrast, has rendered colloquies insufficient. *See McGrew*, 2013 WL 2948448, at *6–7; *Rhodes*, 2014 WL 1095327, at *6.

To be sure, after asking Plaintiff if he wanted a lawyer or something, the ALJ stated "she can translate anything." (R. at 75.) But this statement is susceptible to multiple interpretations, neither of which adequately explain counsel's role. In stating that "she" can help translate anything, the ALJ may not have been referring to a potential *attorney*, but the *female translator* in attendance. (R. at 75–76.) Indeed, the ALJ made this statement at the start of the colloquy, which occurred at the hearing's outset. If the ALJ was referring to the female translator, then the ALJ provided no explanation of how counsel could assist in the proceeding. If, by contrast, the ALJ stated that an *attorney* could "help translate anything," that statement is insufficient because it does not explain the attorney's role in any comparable way to the colloquies in *Vivaritas* or preceding cases.[4]

Nor does the ALJ's follow-up questioning at the subsequent hearing change this conclusion. When asked if he still did not want a lawyer, Plaintiff responded, "I remember he

---

[3] *See also Whetstone*, 2017 WL 5047899, at *2–3, n.4 (finding colloquy sufficient when, unlike here, ALJ explained that a "representative can help you find evidence, explain things to you, [and] make arguments on your behalf"); *George*, 2014 WL 3955071, at *3 (noting that colloquy would have been sufficient except for subsequent hearing testimony calling the waiver into question when colloquy contained "identical" language to *Vivaritas* about how "how counsel may assist the claimant"); *Morris*, 2018 WL 395736, at *5 (finding colloquy sufficient when it explained that a representative could "gather medical records and other documents," and help "organize" and "present" the case).

[4] If, although clarified by neither party, Plaintiff did in fact retain and utilize an attorney named Eric Shore in this case, he may have some understanding of how an attorney could help in the proceeding. But the Court declines to make assumptions about Plaintiff's understanding, and whether Plaintiff fully understood how an attorney could help his case is merely a side issue: the ALJ did not explain the attorney's role in a manner that would satisfy the Seventh Circuit's test or compare to the sufficient exchanges in *Vivaritas* and other cases cited here.

7

asked me if I wanted an lawyer, but we haven't found one. It's better-." This exchange does not cure the initial colloquy's inadequacies as explained above, and a claimant cannot knowingly and intelligently waive that which is unexplained. And Plaintiff's statement that he had not found a lawyer does not reveal whether he fully understood counsel's role in the hearing—he may have understood only what the initial colloquy inadequately explained. Thus, the Court cannot presume that Plaintiff's comments were a valid expression of his desire to proceed *pro se*.[5]

Defendant's argument falls flat. Defendant makes no attempt to analyze the ALJ's exchanges under the standards above. Instead, Defendant merely lists the exchanges and concludes that the ALJ obtained a knowing and intelligent waiver because the "the ALJ explained to Plaintiff at relative lengths his rights, including his right to obtain representation." (Def.'s Br. at 12.) As explained above, the Court finds that those standards—whichever applied—were not met here. Accordingly, Plaintiff did not knowingly and intelligently waive his right to counsel.

### B. Prejudice or Unfairness

The Court also finds that Plaintiff was prejudiced by the lack of counsel. Plaintiff identifies several evidentiary gaps he believes prejudicial because, as he argues, the ALJ relied

---

[5] Although raised by neither party, one court in this district has rejected the Seventh Circuit's test under *Vivaritas* and found a valid waiver when the claimant received sufficient correspondence from the Commissioner advising of the claimant's right to representation. *See Taylor v. Comm'r of Soc. Sec.*, No. 16-cv-05033, 2018 WL 2298358, at *7 (D.N.J. May 21, 2018) (citing *Phifer v. Comm'r of Soc. Sec.*, 84 Fed. App'x. 189, 191 (3d Cir. 2003)); *see also Bentley v. Comm'r of Soc. Sec.*, No. 10-cv-2714, 2011 WL 4594290, at *9 (D.N.J. Sept. 30, 2011). Even if Plaintiff received such correspondence, the ALJ did not ask Plaintiff if he received, let alone understood, those notices. Thus, the Court cannot determine if Plaintiff reviewed and understood any such information to support a knowing and intelligent waiver of his right to counsel. *See Nevins*, 2017 WL 2450280, at *3 (finding written notice insufficient to constitute a valid waiver of the right to counsel because the "ALJ did not verify that Plaintiff had ever received written notice, let alone that he understood same"); *Yakely*, 2013 WL 1010671, at *1 n.1 ("[B]ecause the First Hearing colloquy did not reference that document, the Court cannot determine whether Yakely received, reviewed, or understood the information contained therein.").

8

on that "missing evidence" to find that Plaintiff was not disabled. (Pl.'s Br. at 15–19.) For example, in finding that Plaintiff's substance abuse disorder was his only severe impairment, the ALJ noted that cervical imaging obtained at the time of Plaintiff's car crash "does not appear in the record," and although Plaintiff "likely experienced" head trauma, "no imagining of the claimant's brain appears in evidence." (R. at 29.) Regarding Plaintiff's mental health, the ALJ found that Plaintiff suffered only one or two episodes of decompensation, at least one of which appeared accompanied by substance abuse, which the ALJ seemingly noted to erode the role that Plaintiff's mental impairments played in the episode. (R. at 30, 32.) But as Plaintiff points out, the ALJ commented about related missing evidence: the ALJ noted that "no objective conf[ir]mation, such as a urinary drug screening" existed in evidence to confirm Plaintiff's claim that he no longer uses drugs. (R. at 32.) The ALJ also noted that Plaintiff "told one consultative examiner that he had been hospitalized 4 times, but this claim is not documented by the medical evidence in the current record." (R. at 30.)

Plaintiff similarly alleges that a prejudicial evidentiary gap exists regarding apparently missing "progress notes," which the ALJ explained were "not in evidence" to support Plaintiff's schizophrenia diagnoses from Cumberland County Guidance Center. (R. at 33.) The ALJ suggested that these notes could be relevant to substantiate provider E. Stafford's opinion, which the ALJ gave "little weight." (R. at 32.) Stafford opined that Plaintiff is unstable and unable to go to work or school. (R. at 32.) Finally, Plaintiff points to the ALJ's reliance on the medical expert's testimony for the conclusion that "it cannot be determined what the claimants symptoms are when he is not using" drugs. (R. at 32.) The medical expert opined that he "would need updates" if anything existed at Cumberland to determine if Plaintiff showed sobriety and signs and symptoms of an emotional problem absent substance abuse. (R. at 43.)

9

The Court finds that Plaintiff suffered prejudice because, as Plaintiff argues, counsel may have helped fill in the gaps and develop the issues as to Plaintiff's drug use, periods of sobriety, and medical treatment. (Pl.'s Br. at 19.) In addition to this issue, the Court also finds that Plaintiff suffered prejudice from the lack of counsel as it relates to the VE's testimony. Indeed, Plaintiff takes issue with the ALJ's representations to the VE, including those relating to GAF scores, and claims prejudice because counsel would have disputed those statements. (Pl.'s Br. at 11, 16–17.)

The analysis in *McGrew* is instructive. 2013 WL 2948448, at *7. After finding that the plaintiff did not validly waive the right to counsel, the *McGrew* court found resulting prejudice. *Id.* The court reasoned that when the ALJ examined the VE, "all of the testimony was in jargon" like "semi-skilled SVP:4, medium exertion" that a person "without specialized training in social security disability determinations" would not understand. *Id.* Nor did the ALJ explain or ask the VE to explain what the jargon meant or why it was important. *Id.* Although the ALJ asked the plaintiff if she had questions for the VE, he did not explain to her why questioning the VE was important or assist the plaintiff in asking questions that may have assisted plaintiff's case. *Id.*

The Court finds similar issues here. Although the ALJ explained the five-step evaluation process to Plaintiff before questioning the VE at the August 2015 hearing and defined the abbreviation "SGA," (R. at 54–55), the examination included much jargon that, like in *McGrew*, would likely confuse Plaintiff, who is unfamiliar with disability determinations and speaks limited English. For example, the examination referenced "strength jobs," GAF scores, "moderate," "severe," and "marked" limitations, "GED 111," "solitary thing jobs," and "SVP 2, unskilled." (R. at 55–57.) Although to a lesser degree, the brief exchange with the VE at the July 2014 hearing contained similar dialogue. (R. at 81.) The Court notes that using these terms

may be necessary to communicate disability concepts, but like in *McGrew*, the ALJ had a duty to explain them and their importance to Plaintiff under the circumstances of this case. Yet the ALJ did not. (R. at 54–58, 81–83.)

Moreover, unlike *McGrew*, the transcripts contain no statement from the ALJ notifying Plaintiff that he could cross-examine the VE. (R. at 54–59.) Although Defendant argues that the ALJ's representations to the VE about Plaintiff' GAF scores were not erroneous, (Def.'s Br. at 14–15), Plaintiff still has a due process right to be given a chance at cross examination, be it about GAF scores or any other ground. *See Wallace v. Comm'r of Soc. Sec.*, No. 13-cv-6755, 2014 WL 6667362, at *6 (D.N.J. Nov. 21, 2014) ("Consistent with due process, claimants must be given an opportunity to cross-examine the vocational expert.") (citing *Wallace v. Bowen*, 869 F.2d 187, 192 (3d Cir. 1989)). Thus, Plaintiff was prejudiced by the lack of counsel, who may have challenged the ALJ's representations to the VE and cross-examined the VE's direct testimony. *See Nevins*, 2017 WL 2450280, at *3 (finding that the "lack of representation resulted in prejudice at the administrative hearing" when an attorney might have "cross examined the VE's direct testimony"); *Howe v. Astrue*, No. 12-cv-93, 2013 WL 593975, at *3 (W.D. Pa. Feb. 14, 2013) (remanding because "a claimant has the right to cross-examine vocational experts as a part of procedural due process," but plaintiff "was not advised that he could ask any questions of the VE"); *accord Gauthney v. Shalala*, 890 F. Supp. 401, 410 (E.D. Pa. 1995). [6]

---

[6] Although an unidentified witness injected some testimony at the end of the ALJ's VE examination, that testimony concerned an apparent sauce and television-throwing incident at a condominium and a past suicidal comment by Plaintiff. (R. at 58–59.) The unidentified witness's remarks, which do not appear related to the VE's testimony, fall short of an opportunity to cross-examine the VE. *See Wallace*, 2014 WL 6667362, at *6.

Accordingly, the Court finds remand appropriate and does not reach the parties' remaining arguments. *See Vivaritas*, 264 Fed. App'x. at 156–57; *Nevins*, 2017 WL 2450280, at *4 ("Since the matter was decided on the absence of a meaningful waiver of the right to representation, the court declines to comment on the parties' other arguments."). The Court presumes that Plaintiff will retain counsel on remand, but if not, the ALJ should explain his right to have counsel, obtain a valid waiver, and fully develop the record as necessary.

## III. CONCLUSION

For the reasons above, the Court **REMANDS** this matter to the Social Security Administration. An Order shall issue.

Dated: 12/26/2018                                             /s/ Robert B. Kugler
                                                              ROBERT B. KUGLER
                                                              United States District Judge